UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ROBINSON CADET, SR. and VANESSA
CADET,

                              **MEMORANDUM & ORDER**

              Plaintiffs,

                              Civil Action No. 05-5042

   -against-

P.O. JOHN MILLER, Shield No. 0286,
P.O. JOSEPH GIACONE, Shield No. 2796,
P.O. KURT FARACZEK, Shield No. 1586,
P.O. NATALIE COPPOLA, Shield No. 2509,
and THE COUNTY OF NASSAU,

                Defendants.
----------------------------------------------------------X

**APPEARANCES:**

**ALAN D. LEVINE, ESQ.**
Attorney for Plaintiffs
80-02 Kew Gardens Road, Suite 1010
Kew Gardens, NY 11415

**LORNA B. GOODMAN**
**NASSAU COUNTY ATTORNEY**
Attorney for Defendants
One West Street
Mineola, NY 11501
By:   Donna A. Napolitano, Esq.
         Liora M. Ben-Sorek, Esq.

**HURLEY, Senior District Judge**:

       Plaintiffs Robinson Cadet Sr. ("Robinson") and Vanessa Cadet ("Cadet") (collectively

"Plaintiffs") commenced this action pursuant to 42 U.S.C. § 1983, as well as New York State

law, against Nassau County (the "County") and Nassau County Police Officers John Miller

("Miller"), Joseph Giacone ("Giacone"), Kurt Faraczek ("Faraczek"), and Natalie Coppola ("Coppola") (collectively the "Officers").[1] Plaintiffs allege that the Defendants violated their constitutional rights and committed common law torts during an encounter that occurred on January 28, 2005 between Cadet and the Officers. Specifically, Plaintiffs assert their Fourth Amendment rights were violated as a result of a false arrest and illegal entry and search of the their home and that Defendants committed the following common law torts: battery, false arrest/false imprisonment, intentional infliction of emotional distress, destruction of property, and negligent employment. Presently before the Court is the Defendants' motion for summary judgment. For the reasons set forth below, the claims for intentional infliction of emotional distress and negligent employment are dismissed,[2] and the motion for summary judgment is granted in part and denied in part.

**Background**

The following facts are undisputed unless otherwise noted:

During the afternoon of January 28, 2005, Cadet, then an eleventh grade high school student, was home alone in the two-story, single family home she shared with her parents and two older siblings at 96 Carroll Avenue in Valley Stream (the "home" or "residence"). The first floor of the home consists of a living room, kitchen, dining room, and bathroom. The second floor has three bedrooms and a bathroom. The home also has a basement that contains two

---

[1] The County and the Officers shall be referred to collectively as the "Defendants."

[2] Plaintiffs have withdrawn their claims for intentional infliction of emotional distress and negligent employment. *See* Pls.' Mem. in Opp. at 23.

bedrooms and a bathroom. There are four entrances into the home: two in the kitchen (a front door and a side door), one in the living room, and one in the basement.

Cadet arrived home at approximately 12:15 p.m. and entered the home through the side kitchen entrance. The other three entrances were locked. When she arrived home she went to her bedroom on the second floor to watch television. While upstairs, she heard a noise similar to a door closing and thought someone was in the house. She called out "hello" and, when no one answered, proceeded down the stairs. As she descended, she again heard the sound of a door closing. She entered the kitchen and called down the basement stairs that she was "going to call the cops."

Cadet then made several calls to 911. On the first call, she hung up when the operator answered. The 911 operator called back and Cadet told the operator that someone was in her house "bothering her," but then hung up a second time. Approximately five minutes later, Cadet again called 911 and told the operator that she believed someone was robbing her house. The operator advised her that police officers were being dispatched to the home. Cadet then went down to the basement to check the bedrooms to see if her brother or sister was home; the operator remained on line while she did so. When Cadet returned to the kitchen, she spoke to the operator again. Approximately three minutes later, Cadet called 911 for the final time. She apologized for the calls and said that she did not need the police because her sister had been "playing around." According to the mobile digital transmissions records submitted, this last call was received at 1:09:42 p.m.

At about the time Cadet was on the final call to the 911 operator, Officers Faraczek and Giacone arrived at the premises within approximately two minutes of each other. The two officers were responding to a radio transmission from the Nassau County Police Department Communications Bureau, which indicated that there was a possible burglary in progress.[3] The two officers called for back-up and officers Miller and Coppola (at the time a police recruit) arrived at 1:16:03 p.m. The Officers were at the residence between 25 and 45 minutes.

The parties' versions of what happened while the Officers were at the residence are markedly different. The Court shall set forth Cadet's version, followed by the version offered by the Defendants.

According to Cadet, after she spoke with the 911 operator for the last time, she started to go upstairs. As she did so, she looked out the front door window and saw police officers approaching the house with their guns drawn. She opened the door and told the officers everything was fine; she had just spoken to the 911 operator and their services were not needed. The two officers at the door were Giacone and Faraczek. Cadet made no attempt to prevent Giacone and Faraczek from entering the house. They asked Cadet who was at the house and who she was. She responded that "no one is here" and that "I am a resident here." Cadet maintains that before she had an opportunity to identify herself as Vanessa Cadet, Giacone responded he did not know that she was a resident and ordered the other officer to cuff her. As she was being cuffed, she told the officers she had identification on her - in the back pocket of her blue jeans. The officers ignored her although she repeated a number of times that her identification was in

---

[3] The radio transmission from the police department concerning the last conversation between Cadet and the operator to the effect that the police were not needed because Cadet's sister had been "fooling around" was made after Faraczek and Giacone entered the residence.

4

her jean's pocket. They pushed her inside, up against a wall, and cuffed her behind her back. As she was standing by the wall, officers Miller and Coppola entered the house through the open front door. Coppola, who had been directed to watch Cadet, then brought her into the kitchen and sat her down. Cadet remained handcuffed in the kitchen with Coppola for approximately twenty minutes. During this period of time, Cadet begged for the cuffs to be released because they were so tight and asked several times for a tissue as she was crying. She also repeatedly requested that the Officers call her father; she gave the Officers her parents' cell phone numbers. She also demanded an attorney. While she was cuffed and in the kitchen, she could see the officers searching the first floor of the house. After approximately twenty minutes, Officers Miller, Giacone and Faraczek returned to the kitchen. One of them had Cadet's driving permit. According to Cadet, her permit had been in the pocket of a coat that was hanging in her closet. She maintains she never told the Officers that she had identification in the pocket of her coat. Rather, she told them throughout the time in question that her identification was in her back pocket; however, none of the Officers made any attempt to look at this identification during the time they were in the house. Once the officers returned to the kitchen with Cadet's identification, Coppola was directed to remove the handcuffs. Miller informed Cadet she could be arrested for filing a false claim and asked her where she attended school. When she replied "Central," he told her that he was very good friends with her principal and that "he'll talk to him." Cadet also spoke to one of the other male officers, who was going through mail that was in the kitchen. She asked him to call her parents. He said he would do so later. The Officers then left.

5

After the Officers departed Cadet went upstairs to get a coat to go over to a friend's house. Her room was in disarray; it had not been so prior to the Officers' arrival. Her dresser drawers were open, the clothes in her closet were separated, and the bed sheets were folded as if someone was looking under her bed. She did not look at the other rooms in the house at that time. It was not until later that she learned the drawers of the furniture in the other bedrooms had also been opened. After retrieving a coat, Cadet left the house to visit some friends. Thereafter, she went to get her nails done before returning home.

When Cadet arrived back home, her whole family was there. Her room was still in disarray. Her parents were on the telephone, so it was nearly forty-five minutes before she was able to tell her parents anything about what happened with the police. At this point her wrists had begun to swell. About a week later, Cadet sought medical attention for her wrist.

According to Robinson, Cadet's father, nothing appeared out of the ordinary on the first floor of the house when he arrived home, but the second floor was in disarray. Among other things, clothes were on the floor in the bedrooms and his armoire, where he keeps a number of expensive pens, was open. It was a couple of days later that he realized that a Mont Blanc pen he owned was missing.

The course of events, as testified to by the Officers, was as follows. Officers Giacone and Faraczek approached the house at 96 Carroll at the same time. Faraczek opened the screen door and tried getting into the house, but there was a female behind the wooden door pushing it closed. The female (Cadet) was screaming "Get out, get out, I don't want you here." Faraczek pushed his way in, causing the female to fall backwards. He kept asking her "what was going on." Her only response was "This is my house. Get out, get out." But as she is yelling, "she is

6

looking behind herself, towards the back of the house," leading the officers to believe that there is someone else in the house. Because he did not know if she was a victim or a suspect, Faraczek handcuffed Cadet's hands behind her back. He checked the cuffs to make sure they were not too tight. He asked her to calm down, what was going on, and who called 911. Cadet did not answer these inquiries, but rather kept screaming "I want you out of here. Get out, get out." Faraczek grabbed her arm, told her to slowly bend her knees and put her down on the floor. At this point in time Giacone was calling for back-up. Faraczek stood next to Cadet looking towards the back of the house until officers Miller and Coppola arrived. Once they arrived, the Officers decided to search the house to determine whether a home invasion or other criminal activity was occurring. They un-holstered their guns and Faraczek, Miller, and Giacone proceeded to search the house looking solely in areas that a person could be hiding, e.g., in closets and under beds. No one was found and they returned to the kitchen where Coppola was guarding Cadet. As Cadet was then calm and answering question, they uncuffed her. It was at this time that Cadet first told them where her identification was located. Faraczek went and retrieved it. While uncuffed, Cadet asked the Officers to call her father. Faraczek started to call the father but did not complete the call as Cadet changed her mind and asked him to stop. She told the Officers her father was in the city making funeral arrangements and she did not want to upset him. There was also some conversation regarding school and why Cadet was not in attendance. The Officers then left.

### Discussion

**I. Summary Judgment Standard**

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other

documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008); *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009); *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See SCR Joint Venture*, 559 F.3d at 137; *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are

not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). "Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertions that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Patterson*, 375 F.3d at 219 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *See id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863

9

F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). In deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987).

## II. Section 1983 Claims

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. This statute furnishes a cause of action for the violation of federal rights. *See Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). To prevail on a Section 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right. *See id.*; *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). In other words, a Section 1983 claim has two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges. *See Eagleston v. Guido*, 41 F.3d 865, 872 (2d Cir. 1994).

### A. Material Issues of Fact Exist as to the 1983 Claims

Here, Cadet claims that Defendants violated her Fourth Amendment rights. More specifically, she claims she was falsely arrested, and that both the entry and search of her home

were illegal. In support of their summary judgment motion, Defendants maintain that (1) exigent circumstances permitted the police to lawfully enter and search the home; (2) Cadet was never arrested but if she was there was probable cause for the arrest; and (3) they are entitled to qualified immunity. Cadet does not address the issue of initial entry, but rather argues that viewing the facts in the light most favorable to her, the scope of the search was unreasonable and the Officers' presence in the house was far more lengthy and intrusive than it had to be and constituted an arrest.

The Fourth Amendment protects the right of the people to be secure in their houses and effects against unreasonable searches and seizures. *Arizona v. Evans*, 514 U.S. 1, 10 (1995). Generally, a warrant is required before a search and seizure may be conducted, unless an exception to the Fourth Amendment's warrant requirement exists. *Arizona v. Hicks*, 480 U.S. 321, 326 (1987) (recognizing exigent circumstance exception to warrant requirement). One well-established exception to the warrant requirement is the exigent circumstances exception, which permits law enforcement to enter a home without a warrant to provide assistance, or effect a search or seizure under specified conditions. *See, e.g., United States v. Klump*, 536 F.3d 113, 117 (2d Cir. 2008); *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (en banc).

To the extent Cadet claims that the initial entry into the house was unlawful, summary judgment is granted to Defendants. Accepting those facts that are uncontested as well as Cadet's version of the events, she did not refuse the officers permission to enter the house and at the time they did so, officers Giacone and Faraczek had not been notified of Cadet's final conversation with the 911 operator to the effect that everything was fine and her sister was just "fooling" with her. In fact, it is uncontested that at the time of entry into the house these officers reasonably

believed that there was a burglary in progress. Thus, the officers were "confronted with an urgent need to render aid or take action." *See Anthony v. City of New York,* 339 F.3d 129, 135 (2d Cir. 2003) (internal quotations omitted). Such exigent circumstances were sufficient to justify the warrantless initial entry. *See id.* at 136-37 (2d Cir. 2003) (911 call from location of reported danger justified warrantless entry); *see also United States v. Simmons*, 560 F.3d 98, 105 (2d Cir. 2009).

However, material issues of fact preclude summary judgment as to the remainder of Cadet's 1983 claims. *Cf. Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996) ("The question of whether or not probable cause existed may be determined as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers . . . or may require a trial if the facts are in dispute."). If the trier of fact believes the Officers' version of events, then it would seem that their detention of Cadet and search of the house in places where an intruder could hide did not violate the Fourth Amendment. Police officers may conduct limited searches or protective sweeps without a warrant in order to protect the safety of the police officer or others. *Maryland v. Buie*, 494 U.S. 325, 327 (1990). The authority to search "encompasses those spaces in which an individual may be found." *United States v. Blue,* 78 F.3d 56, 60-61 (2d Cir. 1996). If, however, the trier of fact accepts Cadet's version of the events upon the arrival of Officers Giacone and Faraczek, for example, her testimony that she identified herself as a resident of the home and told the officers she had identification in her back pocket, the situation confronted by the Officers was markedly different. It would seem that in those circumstances, it was incumbent upon the Officers to check Cadet's pocket and her identification to confirm whether she was a resident, either before or shortly after they restrained her. If they ignored her claims without any

attempt to verify them and proceeded to restrain her for the next twenty minutes while they searched the house, a jury could conclude that what may have started as a permissible investigative detention had become an arrest. The salient inquiry is whether officers unreasonably restricted the plaintiff's freedom of movement to permit their limited investigation given the totality of circumstances. *See Posr v. Doherty*, 944 F.2d 91, 99 (2d Cir. 1991). Here, the totality of circumstances upon which that inquiry depends are disputed.

Similarly, there is testimony that prior to the search dresser drawers were closed, while after the search drawers were open. Obviously, the scope of a search for an intruder does not include places where an intruder could not possibly secrete themselves. "[A] search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the [circumstances]." *Safford Unified School Dist. No. 1 v. Redding*, -- U.S. --, 129 S. Ct. 2633, 2648 (2009) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 342 (1985).

Summary judgement is granted on the claim that the initial entry violated the Fourth Amendment but is otherwise denied.

**B. The Material Issues of Fact Preclude Summary Judgment on Qualified Immunity.**

The differing version of events testified to by the parties also mandates the denial of Defendants' motion for summary judgment on their qualified immunity defense.

"The qualified immunity defense is intended to strike a fair balance between (1) the need to provide a realistic avenue for vindication of constitutional guarantees, and (2) the need to protect public officials who are required to exercise their discretion and the related public interest

13

in encouraging the vigorous exercise of official authority." *Lee v. Sandberg,* 136 F.3d 94, 100 (2d Cir. 1997). "Police officers generally enjoy a qualified immunity from liability for their discretionary actions if their conduct does not 'violate clearly established rights of which a reasonable person would have been known,' or if it is 'objectively reasonable to believe that their acts did not violate those clearly established rights.'" *Townes v. New York*, 176 F.3d 138, 143 (2d Cir. 1999) (quoting *Soares v. Connecticut,* 8 F.3d 917, 920 (2d Cir. 1993)). With respect to the qualified immunity defense to an allegation of false arrest, the Second Circuit has held:

> [The defending officer need only show "arguable" probable cause. . . . This is because at its heart the concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. . . . Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause . . . and in those situations courts will not hold that they have violated the Constitution . . . . Therefore, in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity.

*Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir. 2002) (internal quotations and citations omitted.); *see Lee,* 136 F.3d at 102 (officers are entitled to summary judgment on issue of qualified immunity if "the only conclusion a reasonable jury could reach is that reasonable officers could disagree about the legality of the defendant's conduct under the circumstances"). "Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Id.* (quoting *Gold v. City of Miami,* 121 F.3d 1442, 1445 (11th Cir. 1997)).

If the trier of fact accepts the Officers' version of events, i.e., they entered the home,

having been advised that someone had reported an illegal entry, and found a young woman, who was unwilling to identify herself and suspiciously looking towards the back of the house while refusing them entry, and then became hysterical and refused to answer questions, then a reasonably competent officer would, at the very least, have arguable probable cause to detain the young woman while they searched the house for intruders. No such arguable probable cause would exist for the young woman's lengthy detention if Cadet's version of the facts is accepted, viz. that she stated she lived in the house, let the officers enter, and advised them repeatedly that her identification was in her rear pocket.

The motion for summary judgment on the defense of qualified immunity is denied.

## III. The State Law Claims

The Court shall address Defendants' motion vis a vis Cadet's state law claims for false arrest, battery, and destruction of property seriatim.

"Under New York law, 'a plaintiff claiming false arrest must show, inter alia, that the defendant intentionally confined him without his consent and without justification.'" *Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir. 1999) (quoting *Weyant*, 101 F.3d at 852). A claim for false arrest under New York law is substantially the same as a §1983 claim for false arrest. *Id.* "Additionally, the existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Id.* (internal quotation omitted).

Similarly, a state claim for battery arising out of an arrest is comparable to a § 1983 claim for excessive force. *Alhovsky v. Ryan*, 2009 WL 2432688, at *9 (S.D.N.Y. Aug. 7, 2009). Here, the alleged battery is the handcuffing of Cadet. "'The reasonableness of the handcuffing of an

15

arrestee must be determined in light of the minimal amount of force necessary to maintain custody of [the arrestee]. . . . [I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Perez v. City of New York,* 2009 WL 1616374, at *8 (S.D.N.Y. June 8, 2009) (quoting *Esmont v. City of New York*, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005)).

As noted earlier, material issues of fact exist as to whether Cadet's detention was justified, thus precluding summary judgment on the § 1983 false arrest claim. Similarly, issues of fact, such as whether it was reasonable for the officer to handcuff Cadet, whether the handcuffs were unreasonably tight, whether the cuffs should have been removed earlier, whether Cadet complained, and the degree of her injury, exist as to the battery claim. *See Perez*, 2009 WL 1616374, at * 8. These issues preclude summary judgment on the state false arrest and battery claims. *See Jones v. Parmley*, 465 F.3d 46, 64 (2d Cir. 2006).

Issues of fact also preclude summary judgment on the claim for destruction of property. As Defendants recognize: "Before an officer can be liable for property damage resulting from a lawful search, the plaintiff must establish that the police acted unreasonably or maliciously in bringing about the damage." (Defs.' Mem. in Supp. at 19 (quoting *Diaz v. The City of New York*, 2006 U.S. Dist. LEXIS 93923, at *20 (E.D.N.Y. Dec. 29, 2006)). Here, there are fact issues material to whether the search was lawful and whether the police acted reasonably.

The motion for summary judgment on the state law claims for false arrest, battery and destruction of property is denied.

## Conclusion

For the reasons set forth above, the state law claims for intentional infliction of emotional distress and negligent employment are dismissed and the motion for summary judgment is granted as to the § 1983 claim as to the initial entry into the residence but is otherwise denied.

Dated: Central Islip, New York
      September 10, 2009

/s/
Denis R. Hurley
Senior District Judge